**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VICKI SIDESINGER, AS ADMINISTRATRIX OF THE ESTATE OF TODD SIDESINGER, DECEASED<br>Plaintiff | : **JURY TRIAL DEMANDED**<br>: **NO.**<br>: |
| v. | :<br>: |
| YORK COUNTY<br>and<br>PRIME CARE MEDICAL, INC.<br>and<br>WARDEN ADAM OGLE<br>and<br>LIEUTENANT CYLE GILES<br>BADGE NO. 1331 AND C/O'S JOHN/JANE DOE #'S 1-5<br>and<br>CEO THOMAS WEBBER, ESQUIRE<br>and<br>MEDICAL PROVIDERS TIA ROBINSON, CCMA, SAMANTHA SMITH, CRNP, DIANA KNIGHT, RN, AND PRIMECARE MEDICAL PROVIDERS JOHN/JANE DOES #'S 1-5<br>Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**COMPLAINT**

## I. INTRODUCTION

1. Plaintiff brings the action for damages pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the statutory and common laws of the Commonwealth of Pennsylvania, as the result of the death of her brother, Todd Sidesinger, while incarcerated at York County Prison.

## II. JURISDICTION AND VENUE

2. The court has jurisdiction over the Federal Law Claims pursuant to 28 U.S.C. §§1331 and 1343 and jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367 and the principles of pendant and ancillary jurisdiction.

3. Venue is proper under 28 U.S.C. §1391(b) because the cause of action upon which the complaint is based arose in York County, Pennsylvania, which is in the Middle District of Pennsylvania.

## III.  PARTIES

4. Plaintiff, Vicki Sidesinger, is an adult citizen and resident of the Commonwealth of Pennsylvania and was at all relevant times the sister of the decedent, Todd Sidesinger, and the administratrix of his estate.

5. At all relevant times, decedent Todd Sidesinger was a pretrial detainee at York County Prison, who was under the care, custody, and control of Defendants.

6. Defendant, York County, is an entity or political subdivision organized and existing under the laws of the Commonwealth of Pennsylvania, which at all relevant times owned, operated, managed, and maintained York County Prison and had a constitutional duty to ensure the safety and wellbeing of all persons incarcerated/housed in the Prison, including the Deceased.

7. To discharge its constitutional duty to ensure the safety and wellbeing of all persons incarcerated/housed in the Prison, Defendant, York County, contracted with Defendant PrimeCare Medical, Inc. to provide constitutionally adequate medical care and treatment to the persons incarcerated/housed at York County Prison, including the Deceased, Todd Sidesinger.

8. At all relevant times, Defendant York County acted or failed to act through its employees, agents, servants, and/or contractors, including Defendant PrimeCare Medical, Inc., then and there acting in the course and scope of their employment, agency, servanthood, and/or contract.

9.    Defendant York County's delegation to Defendant PrimeCare Medical, Inc. of its responsibility to provide adequate medical care and treatment did not relieve the County of its constitutional duty to ensure the safety and wellbeing of those in its custody, including the Decedent.

10.    Defendant, PrimeCare Medical, Inc., (hereinafter referred to as "PrimeCare") is a business entity organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business located in Harrisburg, Pennsylvania.

11.    At all relevant times, Defendant "PrimeCare" acted or failed to act through its employees, agents, servants, and/or contractors, then and there acting in the course and scope of their employment, agency, servanthood, and/or contract.

12.    At all relevant times, Defendant "PrimeCare" was performing a traditional governmental function under the color of state law and were therefore state actors.

13.    At all relevant times, Defendants York County and "PrimeCare" were responsible for testing, hiring, training, supervising, and disciplining individuals staffing York County Prison.

14.    Defendant Warden Adam Ogle is an adult individual and resident of the Commonwealth of Pennsylvania, who, at all relevant times, was employed by Defendant York County, was acting under color of state law, and had final decision-making authority at York County Prison over all policies and issues relevant to the instant complaint. Warden Adam Ogle is being sued in both his individual and official capacities.

15.    Defendants Lieutenant Cyle Giles, Badge No. 1331 and C/O's John/Jane Doe #'s 1-5 are adult individuals and residents of the Commonwealth of Pennsylvania,

who, at all relevant times, were employed by Defendant York County and were acting under color of state law and are being sued in thier individual capacities.

16.     Defendants, CEO Thomas Webber, Esquire, is an adult individual and residents of the Commonwealth of Pennsylvania, who, at all relevant times, was employed by Defendant "PrimeCare" and was acting under color of state law, and had final decision-making authority at PrimeCare over all policies and issues relevant to the instant complaint. Defendant, CEO Thomas Webber, Esquire, is being sued in his individual and official capacities.

17.     Defendant Medical Providers Tia Robinson, CCMA, Samantha Smith, CRNP, Diana Knight, RN, and PrimeCare Medical Providers John/Jane Does # 1-5 (so designated by fictitious names because Plaintiff, despite the exercise of reasonable diligence, was unable to learn their identities), are adult individuals and residents of the Commonwealth of Pennsylvania, who, at all relevant times, were employed as medical providers at York County Prison by Defendant PrimeCare and/or York County.

18.     At all relevant times, Defendant Medical Providers Tia Robinson, CCMA, Samantha Smith, CRNP,  Diana Knight, RN, and PrimeCare Medical Providers John/Jane Does # 1-5 were acting within the course and scope of their employment, under the color of state law, and pursuant to the customs, policies, and practices of Defendant York County and/or Defendant "PrimeCare". They are being sued in their individual capacities.

## IV.  OPERATIVE FACTS

19.     At all relevant times, Decedent had a medical history of congestive heart failure, acute heart failure, four heart stent placements, chronic total occlusion, cardio

myopathy, myocardial infarction and was diagnosed as being at high risk of sudden cardiac death.

20.    As a result of his severe cardiac condition and high risk of sudden cardiac death, the Decedent was prescribed a ZOLL Life Vest on January 10, 2024.

21.    The ZOLL Life Vest is a wearable cardioverter defibrillator that is worn by persons such as the Decedent who are at high risk of sudden cardiac death.

22.    The Life Vest, which must be worn 24/7 and only taken off to shower, monitors the heart for dangerous rhythms and when it detects a life-threatening rhythm automatically delivers an electrical shock to restore a normal heart rhythm.

23.    The Life Vest has proven highly effective at keeping persons who are at risk of sudden cardiac death alive, with some studies indicating that there is a 96% survival rate for persons wearing the Vest.

24.    The Life Vest runs on a lithium battery, and the charge lasts approximately 24 hours.

25.    To ensure uninterrupted 24/7 monitoring and protection, the Vest comes with two batteries, and while one is in use, the other must be charged, which normally takes around two hours.

26.    The product name "LifeVest" is prominently displayed on the product, as is the manufacturer's information:  ZOLL Medical Corporation.

27.    After receiving the Vest, on February 14, 2024, Decedent was hospitalized at WellSpan Health/York Hospital with heart failure, which required cardiac catheterization and the insertion of two stents.

28.    The Decedent was released from York Hospital on February 15, 2024, and three days later, on February 18, 2024, was arrested on contempt charges for failing

to pay fines and court costs in an old case and taken to York County Prison, where he was incarcerated as a pretrial detainee.

29.     The Decedent was wearing his ZOLL Life Vest when he was taken to York County Prison, and upon intake Defendant Lt. Cyle Giles (Badge No. 1331) and/or C/O's John/Jane Doe #'s 1-5 noted that the Decedent had a medical apparatus for his heart condition.

30.     The initial medical intake at the York County Prison was performed by PrimeCare employee Defendant Tia Robinson, who noted that the Decedent was an elderly man who "has a mobile heart monitor, wears it as a vest and has a side bag that holds the monitor. Pt has four stents in heart. Congestive Heart Failure."

31.     In Chart Notes related to the intake, Defendant Tia Robinson further noted "Pt heart monitor will need charged (sic) when running low. Heart monitor is worn as a vest, side bag to hold device."

32.     The medical intake of the Decedent conducted by Defendant Tia Robinson, including the Chart Notes regarding the Life Vest, were reviewed by Defendant Samantha Smith, CRNP.

33.      The battery in the Decedent's Life Vest ran out early on February 18, 2024, the day he was arrested and committed to York County Prison, and was never charged during the two days before his death.

34.     On February 19, 2024, Decedent submitted a Medical Sick Call request complaining of chest pain and a toothache, with pain that "radiates to his entire jaw", and was seen by Defendant Samantha Smith, CRNP.

35.     An EKG was performed on the Decedent at 10:44:16 am, which came back "abnormal".

36.  Specifically, the EKG provides "SINUS RHYTHM WITH FREQUENT VENTICULAR PREMATURE COMPLEXES INFERIOR INFRACT [ 40+ MS Q WAVE AND/OR ST/T ABNORMALITY IN II/AVF]."

37.  Without consulting the Decedent's cardiologist or any other doctor regarding the results, Defendant Samantha Smith reviewed the EKG and determined it was normal.

38.  In the Death Investigation Report, the Coroner commented on the abnormal EKG:

> Warden Ogle called me prior to sending over the EKG to let me know he had questioned the medical staff about the note saying the EKG was normal. He said he was told by the medical staff that one cannot always go by what the summary says on the top of the EKG and that their policy was for a 'provider' to read the EKG. However, it is our understanding that the provider did not read the EKG prior to the decedent's cardiac arrest, that a nurse had, and they had determined it was 'normal'. I have 8 ½ years experience as a cardiac and critical care nurse, and when I briefly looked at the EKG, it did look to me that the decedent had been having PVCs which can be life-threatening, especially if the patient is having chest pains as this decedent was having at the time.

39.  Defendant Smith's assessed the Decedent as CAD (Coronary Artery Disease) and as having a toothache, provided Acetaminophen 650 mg for the toothache, and sent him back to his cell.

40.  On February 19, 2024, after Decedent was returned to his cell, Defendant Dana Staley, an Administrative Assistant, called Decedent's cardiologist "concerning this Pts Holter monitor", and "to question about how long he was to wear it."

41.  Defendant Staley did not talk to Dr. Andrea Sabocsik, the Decedent's cardiologist, but was informed by her staff that "they had no record of Pt even having a Holter monitor."

42.  A Holter monitor is much different from a ZOLL Life Vest, and continuously records the heart's electrical activity for 24 to 48 hours, and sometimes up to a

month, for the purpose of diagnosing and collecting data on arrythmias and irregular heartbeats.

43. The Holter monitor is not a Vest, and not only looks much different from a ZOLL Life Vest, but also, unlike the Life Vest, it does not have the capability of delivering an electrical shock to restore a normal heart rhythm.

44. On February 20, 2024, at 5:25 am, Decedent reported to medical complaining of chest pain on his left side and allegedly of a toothache.

45. Decedent was seen by Defendant Diana Knight, RN, who noted that "Patient with Cardiac Monitor from home that needs to be charged. No charger available. Patient with c/o chest pain but then states tooth pain also. See EKG. VSS stable please assess."

46. In a Chart Note entered by Defendant Diana Knight, RN at 8:18 am on February 20, 2024, after the decedent had died, she provided the following:

> Inmate to medical with c/o chest pain and toothache approximately 0525. Inmate was assessed by this writer. EKG done, no signs of distress noted. Vital signs stable. Inmate returned to his location in stable condition at approximately 0625. At approximately 0635 a medical emergency was called. Inmate observed in cell on floor unresponsive. 911 called and CPR was started by medical staff. EMS arrived at Approximately 0650. EMS continued CPR as they departed from facility.

47. While the Chart Note entered by Defendant Knight, RN after the Decedent had died references an EKG, and implies that one was administered on February 20, 2024, the only EKG administered to the Decedent was on February 19, 2024, and it was not normal but instead had "PVCs which can be life-threatening".

48. While the Chart Note entered by Defendant Knight, RN after the Decedent had died provides that his "Vital signs stable", on the medical chart related to her examination of the Decedent the space next to the word "Vitals" is left blank.

49. While the Chart Note entered by Defendant Knight, RN after the Decedent had died provides "no signs of distress noted", the medical chart indicates that Decedent was complaining of a throbbing chest pain on this left side that got worse with movement.

50. The medical chart further fails to provide any numbers related to the Decedent's "Heart Rate and Rhythm", but instead provides "Normal heart rate, pulse regular."

51. While the Chart Note entered by Defendant Knight, RN after the Decedent had died provides that at approximately 0625 the Decedent was "returned to his location is stable condition", the Defendant was found unresponsive in his cell at 0635, with no pulse, and after efforts to resuscitate him was pronounced dead at approximately 7:47 am upon his arrival at UPMC Memorial Hospital.

52. The Decedents cause of death was cardiac arrest.

53. Registered Nurse Justin Herbst from UPMC noted that he was informed by York County Prison guards that Decedent's Life Vest had not been charged at all over the weekend and that Decedent had not been provided with his daily medications while at York County Prison.

54. At the time he was committed to York County Prison, Decedent had been diagnosed with a serious, life-threatening heart condition that required ongoing medical care and treatment and had made Defendants Tia Robinson and Samantha Smith aware of this serious medical condition during the intake process at the prison.

55. As part of the Decedent's medical care and treatment he had been prescribed a Life Vest, which was needed to protect him from the substantial risk of sudden cardiac arrest.

56.    York County Defendants Lt. Cyle Giles and C/O's John/Jane Does #1-5, and PrimeCare Defendants Tia Robinson, Samantha Smith, Diana Knight, and PrimeCare Medical Providers John/Jane Doe #'s 1-5, knew or should have known from the information obtained during the intake process at York County Prison that upon commitment the Decedent was wearing a ZOLL Life Vest, which is only prescribed for persons at risk of sudden cardiac death, and therefore that he was at a substantial risk of  sudden cardiac death.

57.    York County Defendants Lt. Cyle Giles and C/O's John/Jane Does #1-5, and PrimeCare Defendants Tia Robinson, Samantha Smith, Diana Knight, and PrimeCare Medical Providers John/Jane Doe #'s 1-5 knew or should have known that the ZOLL Life Vest detects a life-threatening rhythm and automatically delivers an electrical shock to restore a normal heart rhythm and was medically necessary to keep the Decedent alive.

58.    York County Defendants Lt. Cyle Giles and C/O's John/Jane Does #1-5, and PrimeCare Defendants Tia Robinson, Samantha Smith, Diana Knight, and PrimeCare Medical Providers John/Jane Doe #'s 1-5 knew or should have known that the ZOLL Life Vest required regular charging, and that if the Life Vest was not charged it exposed the Decedent to a substantial risk of sudden cardiac death, and this risk was obvious.

59.    Despite their knowledge that without a charged and functioning Life Vest the Decedent was exposed to a substantial risk of sudden cardiac death, York County Defendants Lt. Cyle Giles and C/O's John/Jane Does #1-5, and PrimeCare Defendants Tia Robinson, Samantha Smith, Diana Knight, and PrimeCare Medical Providers John/Jane Doe #'s 1-5 negligently and/or recklessly and/or with deliberate indifference failed to charge the Decedent's

Life Vest upon his commitment to York County Prison or any time thereafter, allowing the Decedent to remain unprotected from February 18, 2024 until his death on February 20, 2024.

60.    York County Defendants Lt. Cyle Giles' and C/O's John/Jane Does #1-5's, and PrimeCare Defendants Tia Robinson's, Samantha Smith's, Diana Knight's, and PrimeCare Medcial Providers John/Jane Doe #'s 1-5's negligence and/or recklessness and/or deliberate indifference in failing to charge the Decedent's Life Vest from February 18, 2024 to February 20, 2024, was the proximate cause of his death from cardiac arrest.

61.    In addition to being negligent and/or reckless and/or deliberately indifferent to Decedent's serious medical need for a charged and functioning Life Vest, Defendants Samantha Smith, Diana Knight and PrimeCare Medical Providers John/Jane Doe #'s 1-5 were negligent and/or reckless and/or deliberately indifferent in failing to take reasonable measures in response to Decedent's Sick Call Requests on February 19, 2024, and February 20, 2024.

62.    Defendant Samantha Smith reviewed the Decedent's medical intake and knew that he had a serious heart condition that required him to wear a Life Vest; knew that the Life Vest was not charged and functioning; knew that he had four heart stents and that two of those stents had been inserted just four days before he was committed to the prison; knew that he suffered from serious heart disease and congestive heart failure; and knew that he was at a substantial risk of sudden cardiac arrest.

63.    Despite this knowledge, when Decedent was seen by Defendant Samantha Smith on February 19, 2024, complaining of chest pain with radiating pain in his jaw, she ignored these obvious symptoms of a heart attack and/or cardiac

arrest and attributed the symptoms, including the chest pain, to a toothache, and prescribed the Decedent Acetaminophen.

64.    Despite this knowledge, when Defendant Samantha Smith ordered an EKG for the Decedent on February 19, 2024, and the results came back abnormal, with PVC's and Q Waves, which are indicative of a potentially life threatening condition, especially when coupled with chest pain and radiating pain in the jaw, she did not refer the EKG to the Decedent's cardiologist for consultation or to a Doctor for consultation, but instead determined on her own that the EKG was normal -- deliberately ignoring the EKG results and the Decedent's symptoms, and sent him back to his cell with Acetaminophen for the alleged toothache.

65.    Defendant Diana Knight knew that the Decedent had a serious heart condition that required him to wear a Life Vest; knew that the Life Vest was not charged and functioning; knew that he had four heart stents and that two of those stents had been inserted just four days before he was committed to the prison; knew that he suffered from serious heart disease and congestive heart failure; and knew that he was at a substantial risk of sudden cardiac arrest.

66.    Despite this knowledge, when Decedent was seen by Defendant Diana Knight on February 20, 2024, shortly before he died of cardiac arrest, complaining of chest pain, she did not take his vitals, although she claimed she did after his death, did not take his heart rate and pulse, although she claimed she did after his death, and did not take an EKG, although she implied that she did, but instead relied upon Defendant Samantha Smith's determination that the February 19, 2024 was normal, when it was not.

67.    Despite her knowledge of the Decedent's serious heart condition and risk of sudden cardiac death, and his complaints on February 20, 2024 of left sided chest pain, Defendant Diana Knight ignored the Decedent's symptoms and did not make any effort to determine his current medical condition, but instead sent him back to his cell at 0625, where he collapsed at 0635 and died.

68.    Defendants Samantha Smith, Diana Knight and/or PrimeCare Medical Providers John/Jane Does #'s 1-5 knew that Decedent had a serious heart condition and was at a substantial risk of sudden cardiac arrest, yet negligently and/or recklessly and/or with deliberate indifference ignored the Decedents obvious symptoms of a pending cardiac event, including an abnormal EKG, and as the proximate result of their deliberate indifference to the Decedent's serious medical needs, his symptoms and the medical evidence he had a cardiac arrest and died.

69.    The ZOLL Life Vest worn by the Decedent when he was committed to York County Prison is widely used, with over a million patients worldwide having been prescribed them, and acts as a temporary protective bridge for patients at risk of sudden cardiac arrest who are awaiting future medical procedures, such as the Decedent.

70.    Despite the Vests wide use, and importance in protecting persons with serious heart conditions from sudden death, neither Defendant York County or Warden Ogle, who had final decision making authority over York County Prisons policies, nor Defendants PrimeCare Health, Inc. or Defendant CEO Thomas Weber, Esquire, who had final decision making authority over PrimeCare's policies, had any policies or training regarding the importance, use and

maintenance of the Life Vest, when the need for such policies and training is obvious.

71.     Defendant Prime Care Health, Inc. and CEO Thomas Weber, Esquire also failed to properly train its medical providers regarding the need to have trained professionals read and assess abnormal EKG's when the need for such training is obvious.

72.     Defendant York County is ultimately responsible for ensuring that inmates and pretrial detainees incarcerated/housed at York County Prison receive adequate medical care, even though it delegated this constitutional duty to provide adequate medical care to Defendant PrimeCare Health, Inc.

73.     Defendant York County's constitutional duty to provide adequate medical care includes the duty to oversee PrimeCare Health, Inc's performance of its duties under the contract with York County and the County remains liable for constitutional deprivations caused by the policies, practices and customs of PrimeCare.

74.     Defendants York County and Warden Ogle were deliberately indifferent to the serious medical needs of the inmates and pretrial detainees at York County Prison by not having a policy to monitor Defendant PrimeCare's performance and are further liable for PrimeCare's lack of any policy and/or training regarding the importance, use and maintenance of Life Vests when the need for such policy and training is obvious.

75.     Defendants York County and Warden Ogle, and Defendants PrimeCare, Inc.'s and CEO Thomas Weber, Esquire's failure to have the above policies and training was the proximate cause of the Decedent's death and the deprivation of his constitutional right to adequate medical care and safety.

**COUNT I - 42 U.S.C. § 1983**
**DUE PROCESS – DELIBERATE INDIFFERENCE TO**
**A KNOWN RISK OF SUDDEN CARDIAC DEATH**
**PLAINTIFF v. LT. CYLE GILES, C/O's JOHN/JANE DOE #'S 1-5, TIA ROBINSON,**
**SAMANTHA SMITH, DIANA KNIGHT AND PRIME CARE MEDICAL PROVIDERS**
**JOHN/JANE DOE #'S 1-5**

76.     All of the preceding paragraphs are incorporated by reference as if more fully
        set-forth herein.

77.     The Decedent had been diagnosed with a serious medical condition, namely
        heart disease and congestive heart failure that included the risk of sudden
        cardiac death, and was prescribe a ZOLL Life Vest, which detects a life-
        threatening rhythm and automatically delivers an electrical shock to restore a
        normal rhythm to the heart.

78.     Decedent was required to wear the Life Vest 24/7, and was wearing it when he
        was committed to York County Prison on February 18, 2024.

79.     Defendants Lt. Gyle Giles, C/O's John/Jane Doe #'s 1-5, Tia Robinson,
        Samantha Smith, Diana Knight and PrimeCare Medical Providers John/Jane
        Doe #'s 1-5 knew that Decedent had a serious heart condition and was required
        to wear the Life Vest at all times to protect him from sudden cardiac death, and
        also knew that the Vest had run out of charge at the time he was committed on
        February 18, 2024, and that the battery to the Vest had to be recharged to
        function and protect the Decedent's from sudden cardiac death.

80.     Despite Defendants Lt. Gyle Giles', C/O's John/Jane Doe #'s 1-5's, Tia
        Robinson's, Samantha Smith's, Diana Knight's and PrimeCare Medical
        Providers John/Jane Doe #'s 1-5's knowledge that the Life Vest was necessary
        and vital to protect the Decedent from the substantial risk of sudden cardiac
        death, and that the Vest needed to be charged to function, the aforementioned

Defendants were deliberately indifferent to the Decedents risk of sudden cardiac death by failing to recharge the Life Vest at any time after the Decedent was committed to the prison.

81.    As a direct and proximate result of the malicious, intentional, deliberate, and/or reckless actions of the aforementioned Defendants, the Decedent suffered excruciating pain and died.

82.    The above-described actions of the aforementioned Defendants were so malicious, intentional and reckless and displayed such a reckless indifference to the Decedent's rights and well-being, that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory and punitive damages against Defendants Lt. Gyle Giles, C/O's John/Jane Doe #'s 1-5, Tia Robinson, Samantha Smith, Diana Knight and PrimeCare Medical Providers John/Jane Doe #'s 1-5 in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

**COUNT II - 42 U.S.C. § 1983**
**DUE PROCESS – INADEQUATE MEDICAL CARE**
**PLAINTIFF v. SAMANTHA SMITH, DIANA KNIGHT AND**
**PRIMECARE MEDICAL PROVIDERS JOHN/JANE DOE #'S 1-5**

83.    All of the preceding paragraphs are incorporated by reference as if fully set forth herein.

84.    Defendants Smantha Smith, Diana Knight and PrimeCare Medical Providers John/Jane Doe #'s 1-5 knew that Decedent had a serious heart condition that required him to wear a Life Vest; knew that the Life Vest was not charged and functioning; knew that he had four heart stents and that two of those stents had been inserted just four days before he was committed to the prison; knew that

he suffered from serious heart disease and congestive heart failure; and knew that he was at a substantial risk of sudden cardiac arrest.

85.    Despite their knowledge that Decedent has a serious medical condition and was at a substantial risk of sudden cardiac death, Defendants Smantha Smith, Diana Knight and PrimeCare Medical Providers John/Jane Doe #'s 1-5 were deliberately indifferent to that substantial risk when they ignored his symptoms of a pending cardiac event, which included left sided chest pain and radiating jaw pain, as well as an abnormal EKG with PVC's and Q Waves, which are indicative of a potentially life threatening condition, and failed to provide the Decedent with any care and treatment for his symptoms and failed to notify his cardiologist or any other doctor regarding his symptoms or take any steps to protect the Decedent from a cardiac arrest.

86.    As a direct and proximate result of the malicious, intentional, deliberate, and/or reckless actions of the aforementioned Defendants, the Decedent suffered excruciating pain and died.

87.    The above-described actions of the aforementioned Defendants were so malicious, intentional and reckless and displayed such a reckless indifference to the Decedent's rights and well-being, that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory and punitive damages against Defendants Samantha Smith, Diana Knight and PrimeCare Medical Providers John/Jane Doe #'s 1-5 in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

**COUNT III - 42 U.S.C. § 1983**
**MONELL CLAIM**
**PLAINTIFF v. YORK COUNTY, PRIMECARE MEDICAL, INC.,**
**WARDEN OGLE, AND CEO WEBBER**

88.    All of the preceding paragraphs are incorporated by reference as if fully set forth

herein.

89.    At all relevant times, Defendants York County, PrimeCare Medical Inc., and

Warden Ogle, who had final decision making authority for York County and

CEO Webber, who had final decision making authority for PrimeCare Medical,

Inc., failed to implement a policy regarding the importance, use and

maintenance of ZOLL Life Vests on inmates/pretrial detainees committed to

York County Prison when ZOLL Life Vests are widely used to protect persons

with serious heart issues from sudden cardiac death, and the need for such a

policy was obvious for the following reasons:

      a.    The ZOLL Life Vest is widely used;

      b.    Unlike a Holter monitor, the purpose of the Life Vest is to protect
persons with a serious heart condition from sudden cardiac death and is
absolutely necessary and vital to the health and safety of the person
wearing them;

      c.    The Life Vest must be worn 24/7 and can only be removed for
showering which presents issues for the prison regarding an inmate who
is wearing the Vest and that inmates' hygiene routine;

      d.    The Life Vest requires maintenance and must be charged on a
regular basis which presents the prison with policy issues regarding
charging and other maintenance issues regarding the Vest.

90.    At all relevant times, Defendants York County, PrimeCare Medical Inc., and

Warden Ogle, who had final decision making authority for York County and

CEO Webber, who had final decision making authority for PrimeCare Medical,

Inc., failed to implement proper training regarding the importance, use and

maintenance of ZOLL Life Vests on inmates/pretrial detainees committed to

York County Prison when the need for such training was obvious as evidenced by the confusion regarding what kind of medical device the Decedent was wearing and the fact that neither the individual York County Defendants nor the individual PrimeCare Defendants who were aware that the Vest needed charging took the time to charge it even though charging the device would have been relatively easy to do and the failure to charge it would result in a substantial risk of cardiac death to the Decedent.

91.    Defendants York County's, PrimeCare Medical Inc.'s, Warden Ogle's, and CEO Webber's, were deliberately indifferent to the Decedent's right to adequate medical care and safety by failing to have a policy or training regarding the importance, use and maintenance of ZOLL Life Vests on inmates/pretrial detainees committed to York County Prison  and this deliberate indifference and lack of a policy and training were the proximate cause of Decedent's death.

92.    Defendants PrimeCare Medical Inc. and CEO Webber failed to have proper training of its medical care providers regarding their role in assessing EKG's when the need for such training was obvious for the following reasons:

   a.   Decedent's EKG was abnormal and had potentially life-threatening PVC's yet Defendant Samantha Smith, who is not a cardiologist or even a doctor determined on her own that the EKG was normal and based her lack of care and treatment for Decedent's symptoms on that determination;

   b.   Contrary to policy, Defendant Samantha Smith failed to contact the Decedent's cardiologist or any Doctor regarding the abnormal EKG results;

   c.   Defendant Diana Knight relied on the abnormal EKG and Defendant Samantha Smith's determination that the EKG was normal in denying the Decedent any care and treatment for his symptoms just minutes before he collapsed and died.

93. Defendants PrimeCare Medical Inc's and CEO Webber's failure to provide adequate training to the medical providers regarding their role in assessing EKG's constituted deliberate indifference to Decedent's right to adequate medical care and the lack of adequate training was the proximate cause of Decedent's death.

94. Defendants York County and Warden Ogle were deliberately indifferent in failing to adequately monitor Defendant PrimeCare Medical, Inc's performance of their duties under the contract and more specifically Defendant Prime Care Medical, Inc's delivery of medical service to the inmates and pretrial detainees in York County Prison, and were deliberately indifferent for not having a policy requiring that the County monitor PrimeCare's medical services on a routine basis when the need for such a policy was obvious.

95. Defendants York County's and Warden Ogle's deliberate indifference in not having a policy requiring the County to monitor PrimeCare's medical services on a routine basis was the proximate cause of the Decedent's death.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff demands compensatory damages against Defendants York County, PrimeCare Medical Inc., Warden Ogle, and CEO Webber jointly and/or severally, in an amount sufficient to fully and adequately compensate Plaintiff, plus interest, costs, attorney's fees, and all other appropriate relief.

<u>**COUNT IV**</u>
<u>**CORPORATE NEGLIGENCE/GROSS NEGLIGENCE**</u>
<u>**PLAINTIFF v. PRIMECARE MEDICAL, INC.**</u>

96. All of the preceding paragraphs are incorporated by reference as if more fully set forth herein.

97. The direct corporate negligence, gross negligence and carelessness of Defendant

98. "PrimeCare" includes, but is not limited to:

a. Failure to properly train its employees, agents, and ostensible agents regarding the need to ensure that inmates with serious physical medical conditions are examined, diagnosed and treated;

b. Failure to formulate, adopt, and/or enforce adequate rules, policies and/or procedures to ensure that inmates with severe medical issues receive needed medicines and adequate services;

c. Failure to establish policies to ensure that inmates with severe physical health issues are being monitored or seen as recommended and on a regular basis.

d. Failure to implement a policy regarding inmates/pretrial detainees who are wearing Life Vests when committed.

99. Defendant "PrimeCare" had actual and/or constructive knowledge of the above acts and omissions which caused harm, increased the risk of harm, and were substantial factors in causing the injuries and wrongful death of the Decedent.

100. The direct corporate and/or gross negligence and carelessness of Defendant "PrimeCare" set forth herein caused harm, increased the harm, and was a substantial factor in causing the injuries and wrongful death of the Decedent.

**WHEREFORE**, Plaintiff, as the administratrix of the Estate of Todd Sidesinger, demands judgment against Defendant PrimeCare Medical, Inc. for an amount in excess of One Hundred Fifty Thousand ($150,000.00), including all damages available pursuant to 42 U.S.C. §1983 and §1988, including compensatory and punitive damages against Defendant "PrimeCare" Medical, Inc., plus interest, costs, attorney's fees, and all other appropriate relief.

<u>**COUNT V**</u>
<u>**NEGLIGENCE/ VICARIOUS LIABILITY**</u>
<u>**PLAINTIFF v. ALL MEDICAL CARE PROVIDERS**</u>

101.  All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

102.  Defendants PrimeCare Medical Providers Tia Robinson, CCMA, and/or Samantha Smith, CRNP, and/or Diana Knight, RN, and/or PrimeCare Providers John/Jane Does # 1-5 had a duty to render reasonable, proper, adequate, and appropriate medical care to Plaintiff's Decedent and to protect him from harm.

103.  As detailed above, the aforementioned Defendants were negligent and careless, and breached their duty of care the Plaintiff's Decedent, and said negligence and carelessness was a substantial factor causing the injuries and wrongful death of the Decedent.

104.  Defendant PrimeCare Medical, Inc. is liable for the negligent conduct of the aforementioned Defendants pursuant to the principles of agency, ostensible agency, vicarious liability and/or respondeat superior.

**WHEREFORE**, Plaintiff as the administratrix of the Estate of Todd Sidesinger, demands judgment against Defendant Medical Providers Tia Robinson, CCMA, and/or Samantha Smith, CRNP, and/or Diana Knight, RN, and/or PrimeCare Medical Providers John/Jane Does # 1-5 jointly and severally, for an amount in excess of One Hundred Fifty Thousand ($150,000.00), including all damages available pursuant to 42 U.S.C. §1983 and §1988, including compensatory and punitive damages against Defendant PrimeCare Medical, Inc., plus interest, costs, attorney's fees, and all other appropriate relief.

**COUNT VI**
**WRONGFUL DEATH**
**PLAINTIFF v. ALL DEFENDANTS**

105.  All of the preceding paragraphs are incorporated by reference as if more fully set forth herein.

106.    Plaintiff brings this action pursuant to the Wrongful Death Act 42 Pa. C.S.A.
Section 8301 and claims all damages recoverable under the Pennsylvania
Wrongful Death Act.

107.    As a direct and proximate result of the aforementioned actions of the
Defendants, the Decedent, Todd Sidesinger, his family and his estate have
suffered severe emotional and pecuniary losses and damages including the
following:

    a.  an amount which will cover all funeral, burial and estate
administration expenses incurred;

    b.  an amount which will fairly and adequately compensate the family
members of the decedent for their loss of such contributions as they
would have received between the time of the death of the decedent and
today. This includes all monies that the decedent would have spent for
or given to his family;

    c.  an amount which will fairly and adequately compensate his family for
the loss of such contributions as the decedent would have contributed
to the support of his family between today and the end of his normal
life expectancy; and

    d.  an amount which will fairly and adequately compensate his family for
the pecuniary and emotional value of the services, society and comfort
that he would have given to his family had he lived including such
elements as provision of physical comfort and services and provision of
society and comfort.

108.    As a direct and proximate result of the Defendants' wrongdoing as set forth
above, which is incorporated herein, Todd Sidesinger's Wrongful Death

beneficiaries suffered, are suffering, and will, for an indefinite period of time in the future, suffer damages, injuries and losses including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from him, including monies which he would have provided for items such as clothing, food, shelter, medical care, education and entertainment, recreation and gifts.

109.    As a direct and proximate result of Defendants' wrongdoing as set forth above, which is incorporated herein, Todd Sidesinger's Wrongful Death beneficiaries have been caused to incur and pay various expenses for medical treatment, hospital care, custodial care, nursing care and medications, and funeral and other expenses related to his death.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Negligence Law, Plaintiff, as the administratrix of the Estate of Todd Sidesinger, demands compensatory and punitive damages against all Defendants, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT VII
### SURVIVAL ACTION
### PLAINTIFF v. ALL DEFENDANTS

110.    All of the preceding paragraphs are incorporated by reference as if more fully set forth herein.

111.    Plaintiff brings this action on behalf of the Estate of Todd Sidesinger, deceased, by virtue of the Survival Act, 42 Pa.C.S.A. § 8302, and claims all benefits of the Survival Act on behalf of the Estate of Todd Sidesinger and other persons entitled to recover under law.

112.    As a direct and proximate result of the aforementioned actions of the
defendants, the decedent, Todd Sidesinger, his family and his estate are entitled
to damages which shall include the following:

    a.  an award of the total net amount that the decedent would have earned
between the date of his death and today;

    b.  an award of the net amount that the decedent would have earned
between today and the natural end of the decedent's life expectancy;
and

    c.  an award of such an amount as will fairly and adequately compensate
the estate for the mental and physical pain and suffering that the
decedent endured from the moment of the improper treatment by the
defendants to the moment of his death as a foreseeable result of the
improper treatment.

113.    As a direct and proximate result of Defendants' wrongdoing as set forth above,
which is incorporated herein, Plaintiff claims on behalf of the Estate of Todd
Sidesinger, all damages suffered by the Estate by reason of the death of Todd
Sidesinger, including without limit the generality of the following: the severe
injuries to Todd Sidesinger, which resulted in his death; the anxiety, horror,
fear of impending death, mental disturbance, pain, suffering and other
intangible losses which Todd Sidesinger suffered prior to his death; the loss of
past, present and future earning capacity suffered by Todd Sidesinger, from the
date of his death until the time in the future he would have lived had he not
died as a result of the injuries he sustained; expenses for medical care; the loss
and total limitation and deprivation of his normal activities, enjoyment of life,
pursuits and life's pleasures from the date of his death until such time in the

future as he would have lived had he not died as a result of the injuries sustained.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Law, the Plaintiff, as administratrix for the Estate of Todd Sidesinger, demands compensatory and punitive damages against defendants, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

ABRAMSON & DENENBERG, P.C.


/s/__*Alan Denenberg*_____
ALAN DENENBERG
ATTORNEY FOR PLAINTIFF